# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| TODD B. CUMBERLEDGE, | ) | CASE NO. 1:13-cv-2067 |
| | ) | |
| Petitioner, | ) | JUDGE JACK ZOUHARY |
| | ) | |
| v. | ) | MAGISTRATE JUDGE GREG WHITE |
| | ) | |
| BRIGHAM SLOAN, Warden | ) | |
| | ) | |
| Respondent. | ) | **REPORT AND RECOMMENDATION** |
| | ) | |

Petitioner, Todd B. Cumberledge ("Cumberledge"), challenges the constitutionality of his conviction in the case of *State v. Cumberledge*, Lake County Court of Common Pleas Case No. 10-CR-000241.  Cumberledge, *pro se*, filed his Petition for a Writ of Habeas Corpus (ECF No. 1) pursuant to 28 U.S.C. § 2254 on September 18, 2013.  On January 21, 2014, Warden Brigham Sloan ("Respondent") filed his Answer/Return of Writ.  (ECF No. 9.)  Cumberledge did not file a Traverse.  For reasons set forth in detail below, it is recommended that the petition be DISMISSED as procedurally defaulted.

## I.  Summary of Facts

In a habeas corpus proceeding instituted by a person in custody pursuant to the judgment of a state court, factual determinations made by state courts are presumed correct.  28 U.S.C. § 2254(e)(1); *see also Franklin v. Bradshaw*, 695 F.3d 439, 447 (6th Cir. 2012); *Montgomery v. Bobby*, 654 F.3d 668, 701 (6th Cir. 2011).  The state appellate court summarized the facts

underlying Cumberledge's conviction as follows:

[*P2]  In December 2008, appellant and Angela Keene began to live together in the City of Ashtabula, Ohio.  As part of their ensuing relationship, they would engage in the use of methamphetamine on the weekends when Keene's children were not home. As a direct result of the drug use, appellant and Keene became acquainted with Jaimee Patton and Jack Whitfield.

[*P3]  Whitfield resided in a separate home in Ashtabula County, Ohio.  During the entire year of 2009 and into the first three months of 2010, Whitfield would basically allow appellant and Keene to come over to his home and stay for sustained periods.  At one point in February 2010, appellant and Keene actually lived in Whitfield's residence for a few weeks.

[*P4]  As part of the "visits" to the Whitfield home, appellant and Whitfield would often engage in the general two-step process of producing methamphetamine. In order to facilitate this production, the two men would also take separate steps, by themselves or through other individuals, to procure the various substances needed to complete the entice process. The substances included pseudoephedrine pills, anhydrous ammonia, lithium batteries, Coleman fuel containers, drain cleaners, and Morton salt.

[*P5]  In regard to the anhydrous ammonia, Whitfield had three metal containers in which the substance could be held.  Two of these containers were old propane tanks which would commonly be used with an outdoor gas grill, while the third was somewhat larger and covered with a camouflage material. The opening valve of each of the three containers had been modified to enable someone to fill up the tank with the substance and then release it at the appropriate time. In order to obtain the anhydrous ammonia, Whitfield would travel to a secluded location in southern Ohio where the substance was kept in large tanks on private property, and then surreptitiously transfer the gas into his three containers at night.

[*P6]  In addition to appellant, Keene, and Patton, other individuals would go to the Whitfield residence to purchase, or barter for, methamphetamine.  One such person was Michael Martin, who had been a friend of appellant while they were in school.  As of February 2010, Martin was residing in a small apartment at the Plaza Motel in Wickliffe, Lake County, Ohio. At some point during that month, Whitfield telephoned Martin and asked if he could come by the apartment to "gas" a small quantity of pseudoephedrine.  In essence, Whitfield wanted to use Martin's apartment to complete the second step of the process for producing methamphetamine. Martin willingly gave him permission, and was also able to provide him with two substances necessary to complete the "gas" step.

[*P7]  Over the ensuing four to five weeks, Whitfield and appellant visited Martin

-2-

together at the Wickliffe apartment on at least two occasions.  Both times, a quantity of pseudoephedrine was "gassed" and the second step for producing methamphetamine was completed.  The three men then split the resulting drug between them.

[*P8]  In early April 2010, Whitfield decided that it was necessary to obtain new anhydrous ammonia from their source in southern Ohio.  Despite the fact that appellant and Keene were no longer residing together, he called her to state that he and Whitfield wanted to use her minivan for the proposed trip. In response, Keene drove the minivan to Whitfield's home, where appellant loaded the three tanks into the back.  After making a momentary stop at Martin's apartment in Lake County, Whitfield and appellant left for southern Ohio, accompanied by Keene and Patton.

[*P9]  On two successive nights, Keene dropped off Whitfield and appellant at a secluded location near the site where the anhydrous ammonia was stored.  On the first night, Whitfield and appellant were accompanied by another man who knew the precise site of the substance.  On the second, they were accompanied by a fifteen-year-old juvenile who was related to the third man.  In each instance, Keene drove around for two hours until appellant telephoned her and indicated that they were ready to be picked up.

[*P10]  Although Whitfield and appellant were not successful the first night, they were able to fill all three of their tanks the following evening.  After Keene had returned to their rendezvous location, the two men loaded the tanks into the vehicle, and they left immediately to drive back to Lake County.  The juvenile who helped in the procurement of the anhydrous ammonia also went with them for the return trip; thus, there were five persons in Keene's vehicle.

[*P11]  Before the group could proceed very far, a leak developed in the valve of one of the tanks.  Even though Keene stopped the minivan and appellant attempted to plug the leak, he was not entirely successful.  As a result, the ammonia gas in the tank continued to leak into the vehicle throughout the remainder of the trip.  This ultimately led to a terribly foul order inside the minivan, and caused the juvenile to lose consciousness.

[*P12]  The group of five persons was finally able to arrive in the City of Wickliffe at about 2:30 a.m. the following morning, with Whitfield driving Keene's minivan.  As the vehicle was travelling on Euclid Avenue near the Plaza Motel, it was spotted by Officer Dan Moreland, a patrolman with the city police department.  Even after the minivan had passed his patrol car travelling in the opposite direction, Officer Moreland continued to observe the vehicle because it was moving at a slow speed and had a large crack in its front windshield.  In light of these two peculiarities, the officer quickly "ran" the vehicle's license plate

number on the mobile data terminal in his patrol car.  In response, the data terminal showed that the vehicle belonged to Keene, and that there was a warrant for her arrest from another municipality.  Accordingly, the officer turned his vehicle around and began to follow the minivan.

[*P13]  Within a short distance after passing the patrol car, Whitfield drove into the driveway of the Plaza Motel and proceeded to the area of the parking lot that was near Martin's apartment.  Upon parking the minivan, Whitfield exited the vehicle and, along with appellant, began to walk toward the back door of the building.  At approximately the same time, Officer Moreland pulled into that same area of the parking lot and parked his patrol car slightly cattycornered to the minivan, so that his headlights were shining at its right side. As he exited his vehicle, the officer tried to waive to Whitfield and appellant to come back to the minivan, but the two men went inside the door.

[*P14]  As Officer Moreland walked toward Keene's minivan, she got out through the right sliding door and stood beside the passenger side of the vehicle. Following a short conversation, he placed her under arrest and put her in the back seat of his patrol car.  Officer Moreland was then able to coax Patton and the fifteen-year-old juvenile to exit the minivan.  In regard to the juvenile, the officer had to shout at him a few times in order to rouse him.

[*P15]  While assisting Patton and the juvenile from the minivan, Officer Moreland noticed the strong order of ammonia in the interior.  The officer also observed a number of items lying on the floor of the vehicle.  For example, he saw valve stems, wrenches, and tubing in an open duffel bag near the juvenile. He also observed an apparatus in Keene's open purse, i.e., a modified lightbulb, that is used to smoke methamphetamine.  Based upon these observations, Officer Moreland concluded that the minivan was either a "mobile meth lab" or being used to transport materials employed in the production of methamphetamine. Therefore, when a second officer arrived at the scene, a full search of the minivan's interior was conducted.

[*P16]  Upon opening the rear door of the vehicle and moving a tarp, the officers saw the three tanks and could hear the "hiss" of the gas which was leaking from one of the tanks.  They further noted that the valves on each tank had been altered. Agreeing that the gas/substance in the three tanks could be hazardous, the officers closed all of the minivan's doors and contacted the local fire department. In light of the other items found throughout the vehicle, the Lake County Narcotics Agency was also called to the scene.  The minivan was then towed to a safe location, where the search of its interior was completed after a warrant had been obtained.

[*P17]  While the two officers were conducting the aborted search, Whitfield and

-4-

appellant came back to the parking lot of the motel.  Although appellant was questioned momentarily about the items in the minivan, he was not detained by the officers at that time.  Similarly, Whitfield and Patton were not arrested during this particular encounter.  However, since the minivan was towed away, none of them had any means of leaving the area, and they remained in the motel over the next few hours.

[*P18]  After transporting Keene to the local police department, Officer Moreland began to question her about the contents of the three tanks.  Eventually, she admitted that the tanks contained anhydrous ammonia.  The officer immediately relayed this fact to Sergeant Brad Kemp of the narcotics agency, who was responsible for determining if the minivan was safe to search.  Because the presence of anhydrous ammonia was an obvious indication of the production of methamphetamine, Sergeant Kemp told Officer Moreland that he should attempt to locate and question the three individuals who had been in the minivan with Keene.  As a result, Officer Moreland and three other officers returned to the Plaza Motel at approximately 6:00 a.m.

[*P19]  Initially, the motel clerk informed Officer Moreland that, of the four units in the wing of the building which Whitfield and appellant had entered, only the apartment of Michael Martin was occupied.  As he approached Martin's unit through the hallway, Officer Moreland again noted a strong chemical odor.  Upon knocking on the unit's door and announcing that he was a police officer, Officer Moreland could hear considerable noise emanating from the apartment.  After a few minutes, Martin's girlfriend opened the door and allowed Officer Moreland to enter.  During the interim period, Martin had tried to escape by leaping out a window, but the other officers easily apprehended him.

[*P20]  Once he was inside the apartment, Officer Moreland again concluded that the chemical smell was so strong that a hazard might exist. Thus, he ordered everyone to leave the unit.  Besides Martin's girlfriend, he found Whitfield and Patton in the unit's bedroom.  In questioning these individuals in the hallway, Officer Moreland learned that appellant could be found in Apartment #24 of the motel. In making his way to that unit, Officer Moreland encountered appellant in the hallway and immediately arrested him.

[*P21]  Within one day of the foregoing events, search warrants were obtained for Martin's unit and Apartment #24.  Significant amount of drug paraphernalia associated with the production of methamphetamine was found in Martin's place. However, only a valve for a propane tank was found in the second unit.

[*P22]  As the investigation ensued and the seized evidence was fully analyzed, criminal charges were brought against all five individuals who had been present in either the minivan or Martin's apartment in the motel.  Whitfield died while his

-5-

charges against [him] were still pending.  Regarding Keene, Patton, and Martin, no trials were ever conducted on their respective charges; instead, each of them negotiated a plea agreement with the state.  As consideration for the reduction of the respective charges, each person agreed to testify against appellant.

[*P23]  In his separate indictment, appellant was charged with one count of illegal manufacturing of drugs, a first-degree felony pursuant to R.C. 2925.04, and one count of illegal assembly of chemicals for the manufacturing of drugs, a second-degree felony pursuant to R.C. 2925.041.  Under the first count, it was alleged that he had knowingly engaged in a part of the production of methamphetamine.  Under the second count, it was stated that he had obtained possession of chemicals to be employed in producing methamphetamine.

[*P24]  Before his case could come to trial, appellant moved for the suppression of the evidence which had been seized during the search of the two apartments and the minivan.  In relation to the apartments, he maintained that Officer Moreland's initial entry into the units had been illegal because none of the occupants had given their consent to the intrusion.  After holding an evidentiary hearing on the matter, the trial court issued a written judgment overruling the motion to suppress.  As the primary basis for its ruling, the trial court concluded that appellant lacked the proper standing to contest the search of the vehicle or the two apartments.

[*P25]  Appellant's four-day jury trial began on September 28, 2010.  As part of its evidentiary submission, the state was allowed to present testimony pertaining to certain prior acts which appellant had committed at the Whitfield residence before April 2010.  The evidence in question was primarily set forth in the testimony of Angela Keene, who indicated, inter alia, that she had seen appellant "cook" methamphetamine on numerous occasions.

*State v. Cumberledge*, 2012 Ohio App. LEXIS 2660, 2012-Ohio-3012 at ¶¶2-26 (Ohio Ct. App.

June 29, 2012).

## II.  Procedural History

### A.    Conviction

On May 21, 2010, a Lake County Grand Jury charged Cumberledge with one count of the

illegal manufacture of drugs in violation of Ohio Revised Code ("O.R.C.") § 2925.04 and one

count of the illegal assembly or possession of chemicals for the manufacture of drugs in violation

of O.R.C. § 2923.041 together with a school vicinity specification.  (ECF No. 9-1, Exh. 3.)

Prior to trial, Cumberledge's counsel filed motions to suppress evidence seized from his arrest and from the initial traffic stop.  (ECF No. 9-1, Exhs. 4 & 5.)  On August 19, 2010, the trial court held a hearing to address the motions, and ultimately denied them in an opinion and order issued on September 7, 2010.[1]  (ECF No. 9-1, Exh. 7, ECF No. 9-4.)

On September 28, 2010, a jury found Cumberledge guilty as charged.  (ECF No. 9-1, Exh. 1.)  On November 1, 2010, the trial court merged the conviction for Count II into Count I, and sentenced Cumberledge to a term of eight years incarceration.  *Id.*

**B.    Direct Appeal**

On December 3, 2010, Cumberledge, through new counsel, filed a Notice of Appeal with the Court of Appeals for the Eleventh Appellate District ("state appellate court") raising the following assignments of error:[2]

1.    The trial court erred to the prejudice of the defendant-appellant by failing to exclude testimony regarding the defendant-appellant's prior bad acts, in violation of the defendant-appellant's due process rights and rights to fair trial as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and section 5 and 10, article I of the Ohio Constitution.

2.    The trial court erred to the prejudice of the defendant-appellant when it denied his motion for acquittal made pursuant to Crim. R. 29(a).

3.    The trial court erred to the prejudice of the defendant-appellant when it

---

[1]  The court also denied Cumberledge's *pro se* motion to dismiss on speedy trial grounds, as well as defense counsel's motion *in limine* to exclude evidence of Petitioner's prior bad acts.  (ECF Nos. 8-15.)

[2]  The first three assignments of error were raised by appellate counsel, while the final three were raised by Cumberledge *pro se* in a supplemental brief filed without leave of court.  (ECF No. 9-1, Exhs. 17 & 19.)  The state appellate court, nonetheless, addressed all six assignments of error in its opinion.  *See Cumberledge*, 2012-Ohio-3012.

returned a verdict of guilty against the manifest weight of the evidence.

4.    The trial court [c]ommitted reversible error in permitting the state to amend the indictment to change the date and time of the alleged crime as the amendment change the identity of crime that was never presented to the grand jury. Crim. R. 7(d).

5.    The trial court erred in denying appellant's motion to suppress evidence that is a product of the poisonal [sic] trees, and where no reasonable/a[r]ticulable suspicion existed that appellant engaged in any criminal activities sufficient to warrant investigative searches and seizure in violation of the 4th [A]mendment of the United States Constitution.

6.    The appellant was denied effective assistance of trial counsel when counsel failed to properly address the legal question concerning Crim. R. 7(d).

(ECF No. 9-1, Exhs. 16, 17, 19.)

On June 29, 2012, Cumberledge's conviction was affirmed.  (ECF No. 9-1, Exh. 2.)

Cumberledge did not file a timely appeal with the Supreme Court of Ohio.  However, on March 8, 2013, Cumberledge filed a Notice of Appeal and Motion for Leave to File a Delayed Appeal with the Supreme Court of Ohio.  (ECF No. 9-1, Exhs. 21 & 22.)  On April 24, 2013, the motion for delayed appeal was denied and the case dismissed.  (ECF No. 9-1, Exh. 23.)

**C.  Federal Habeas Petition**

On September 18, 2013, Cumberledge filed a Petition for Writ of Habeas Corpus and asserted the following grounds for relief:

**Ground One**: Petitioner's right to due process and fair trial under the Fourteenth Amendment were violated when the trial court failed to exclude testimony regarding Petitioner's prior bad acts.

**Ground Two**: The trial court erred to the prejudice of the Petitioner when it denied his motion for acquittal made pursuant to Crim. R. 29(a).

**Ground Three**: The trial court committed reversible error in permitting the state to amend the indictment to change the date and time of the alleged crime as the amendment changed the identity of the crime that was never presented to the

-8-

grand jury.

**Ground Four**: Petitioner was denied effective assistance of trial counsel when counsel failed to properly address the legal question concerning the State amending the indictment after it failed to prove Petitioner committed the offense on the date stated in the indictment.

**Ground Five**: Petitioner's counsel on appeal failed to provide Petitioner with a copy of the decision of the court of appeals affirming the judgment of the trial court, or, alternatively filing the required documents necessary to perfect an appeal, thus violating Petitioner's constitutional right to effective assistance under the Fourteenth Amendment to the United States Constitution.

(ECF No. 1.)

### III.  Exhaustion and Procedural Default

### A.   Exhaustion Standard

Petitioners must exhaust their state remedies prior to raising claims in federal habeas corpus proceedings.  *See* 28 U.S.C. § 2254(b),( c).  This requirement is satisfied "when the highest court in the state in which the petitioner was convicted has been given a full and fair opportunity to rule on the petitioner's claims."  *Manning v. Alexander*, 912 F.2d 878, 881 (6th Cir. 1990).  However, if relief is no longer available in state court, exhaustion can be rendered moot:  "If no remedy exists, and the substance of a claim has not been presented to the state courts, no exhaustion problem exists; rather, it is a problem of determining whether cause and prejudice exist to excuse the failure to present the claim in the state courts."  *Rust v. Zent*, 17 F.3d 155, 160 (6th Cir. 1994); *see Buell v. Mitchell*, 274 F.3d 337, 349 (6th Cir. 2001).

### B.   Procedural Default Standard

Federal courts will not consider the merits of procedurally defaulted claims, unless the petitioner demonstrates cause for the default and prejudice resulting therefrom, or where failure to review the claim would result in a fundamental miscarriage of justice.  *See Lundgren v.*

*Mitchell*, 440 F.3d 754, 763 (6th Cir.2006) (*citing Wainwright v. Sykes*, 433 U.S. 72, 87 (1977)).

A claim may become procedurally defaulted in two ways. *Id.*  First, a petitioner may

procedurally default a claim by failing to comply with state procedural rules in presenting his

claim to the appropriate state court.  *Id.*; *see also Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir.

1986). If, due to petitioner's failure to comply with the procedural rule, the state court declines to

reach the merits of the issue, and the state procedural rule is an independent and adequate

grounds for precluding relief, the claim is procedurally defaulted.[3] *Id.*

Second, a petitioner may also procedurally default a claim by failing to raise and pursue

that claim through the state's "ordinary appellate review procedures."  *O'Sullivan v. Boerckel*,

526 U.S. 838, 848 (1999).  If, at the time of the federal habeas petition, state law no longer

allows the petitioner to raise the claim, it is procedurally defaulted. *Engle v. Isaac*, 456 U.S. 107,

125 n. 28 (1982); *see also Coleman v. Thompson*, 501 U.S. 722, 731-32 (1991); *Lovins*, 712 F.3d

at 295 ("a claim is procedurally defaulted where the petitioner failed to exhaust state court

remedies, and the remedies are no longer available at the time the federal petition is filed

because of a state procedural rule.")  This second type of procedural default is often confused

---

[3]  In *Maupin*, the Sixth Circuit established a four-step analysis to determine whether a
claim is procedurally defaulted.  785 F.2d at 135.  Under this test, the Court decides
(1) whether the petitioner failed to comply with an applicable state procedural rule,
(2) whether the state courts actually enforced the state procedural sanction, (3) whether
the state procedural bar is an "independent and adequate" state ground on which the state
can foreclose federal review, and (4) whether the petitioner has demonstrated "cause"
and "prejudice."  *Id.* at 138-39; *Barkley v. Konteh*, 240 F.Supp.2d 708 (N.D. Ohio 2002).
"In determining whether a state court actually enforced a procedural rule, we apply the
'plain statement' rule of *Michigan v. Long*, 463 U.S. 1032, 103 S. Ct. 3469, 77 L. Ed. 2d
1201 (1983)."  *Lovins v. Parker*, 712 F.3d 283, 296 (6th Cir. 2013) ("a procedural default
does not bar consideration of a federal claim on either direct or habeas review unless the
last state court rendering a judgment in the case 'clearly and expressly' states that its
judgment rests on the procedural bar.") (citations omitted).

-10-

with exhaustion. Exhaustion and procedural default, however, are distinct concepts.  AEDPA's exhaustion requirement only "refers to remedies still available at the time of the federal petition." *Engle*, 456 U.S. at 125 n. 28.  Where state court remedies are no longer available to a petitioner because he failed to use them within the required time period, procedural default and not exhaustion bars federal court review.  *Id*.  In Ohio, a petitioner is not entitled to raise claims in post-conviction proceedings where those claims could have been raised on direct appeal.  *Id*. Thus, if an Ohio petitioner failed to raise a claim on direct appeal, which could have been raised, the claim is procedurally defaulted.  *Id*.

A claim is adequately raised on direct appeal if it was "fairly presented" to the state court. To fairly present a claim to a state court a petitioner must assert both the legal and factual basis for his claim.  *See McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000).  Accordingly, a "petitioner must present his claim to the state courts as a federal constitutional issue--not merely as an issue arising under state law."  *Koontz v. Glossa*, 731 F.2d 365, 368 (6th Cir. 1984).  A petitioner can take four actions in his brief which are significant to the determination as to whether a claim has been fairly presented as a federal constitutional claim: "(1) reliance upon federal cases employing constitutional analysis; (2) reliance upon state cases employing federal constitutional analysis; (3) phrasing the claim in terms of constitutional law or in terms sufficiently particular to allege a denial of a specific constitutional right; or (4) alleging facts well within the mainstream of constitutional law."  *Newton v. Million*, 349 F.3d 873, 877 (6th Cir. 2003).

A petitioner's procedural default, however, may be excused upon a showing of "cause" for the procedural default and "actual prejudice" from the alleged error.  *See Maupin*, 785 F.2d at

-11-

138-39.  "Demonstrating cause requires showing that an 'objective factor external to the defense impeded counsel's efforts to comply' with the state procedural rule." *Franklin v. Anderson*, 434 F.3d 412, 417 (6th Cir. 2006) (*quoting Murray v. Carrier*, 477 U.S. 478, 488 (1986)). Meanwhile, "[d]emonstrating prejudice requires showing that the trial was infected with constitutional error." *Id.*  Where there is strong evidence of a petitioner's guilt and the evidence supporting petitioner's claim is weak, the actual prejudice requirement is not satisfied. *See United States v. Frady*, 456 U.S. 152, 172 (1982); *Perkins v. LeCureux*, 58 F.3d 214, 219-20 (6th Cir. 1995); *Rust v. Zent*, 17 F.3d 155, 161-62 (6th Cir. 1994).  Prejudice does not occur unless petitioner demonstrates "a reasonable probability" that the outcome of the trial would have been different. *See Mason v. Mitchell*, 320 F.3d 604, 629 (6th Cir. 2003) (*citing Strickler v. Greene*, 527 U.S. 263, 289 (1999)).

Finally, a petitioner's procedural default may also be excused where a petitioner is actually innocent in order to prevent a "manifest injustice." *See Coleman v. Thompson*, 501 U.S. 722, 749-50 (1991).  Conclusory statements are not enough – a petitioner must "support his allegations of constitutional error with new reliable evidence-whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence-that was not presented at trial." *Schlup v. Delo*, 513 U.S. 298, 324 (1995); *See Jones v. Bradshaw*, 489 F.Supp.2d 786, 807 (N.D.Ohio 2007).

### 1.  Application to Cumberledge

Respondent asserts that all of Cumberledge's grounds for relief are procedurally defaulted, because none of them were timely raised before the Supreme Court of Ohio.  (ECF No. 9 at 14.)  On March 8, 2013, Cumberledge filed a motion for a delayed appeal in the Ohio

Supreme Court asserting that the reason for his delay was counsel's failure to inform him of the appellate court's decision.  (ECF No. 9-1, Exh. 22.)  Respondent contends that the Supreme Court of Ohio's decision denying his motion for a delayed appeal and dismissing the matter is considered a procedural ruling sufficient to bar habeas review.  *See Bonilla v. Hurley*, 370 F.3d 494, 497 (6th Cir. 2004) (*per curiam*), *cert. denied*, 543 U.S. 989, 125 S. Ct. 506, 160 L. Ed. 2d 375 (2004).

Under Ohio's procedural rules, the Ohio Supreme Court has jurisdiction over timely appeals which are made within 45 days of the state appellate court's decision.  *See* Ohio S.Ct.Prac.R. II § 2(A)(1).[4]  The Ohio Supreme Court may, in its discretion, take jurisdiction over untimely felony appeals upon motion for leave to file a delayed appeal pursuant to Ohio S.Ct.Prac.R. II § 2(A)(4)(a).  However, where the Ohio Supreme Court does not allow the delayed appeal, the *Bonilla* court held that even an unexplained decision by the Ohio Supreme Court decision denying leave to file an untimely appeal is presumed to enforce any applicable procedural bar.

> This case turns upon whether the Ohio Supreme Court entry denying Bonilla's motion for leave to file a delayed appeal constitutes a procedural ruling sufficient to bar federal court review of Bonilla's habeas corpus petition.  Upon examination of the Ohio Supreme Court Rules, we conclude that it does.  The Ohio Supreme Court Rules require a motion for a delayed appeal to state "the date of entry of the judgment being appealed and adequate reasons for the delay."  Ohio Sup.Ct. R. II, Section 2(A)(4)(a).  In addition, the motion must be accompanied by a supporting affidavit and a "copy of the decision being appealed."  *Id*. A motion for a delayed appeal is not required to contain the actual claims and supporting arguments sought to be presented on appeal. *Id*.  Instead, only when "the Supreme Court grants a motion for delayed appeal," is the

---

[4]  The Ohio Supreme Court adopted new rules of practice, which became effective on January 1, 2013.  The 45-day time period has not been changed, though the new rules can be found at Ohio S.Ct. R. 6.01(A)(1) & 7.01(A)(1).

> appellant required to "file a memorandum in support of jurisdiction." Ohio Sup.
> Ct. R. II, Section 2(A)(4)(c). Thus, the applicable Ohio court rules indicate that
> the denial of a motion for a delayed appeal is a procedural ruling, not a ruling on
> the merits.

*Bonilla*, 370 F.3d at 497; *accord Baker v. Bradshaw*, 495 Fed. Appx. 560, 565 (6th Cir. Ohio 2012) ("the timeliness requirements for an appeal to the Ohio Supreme Court ... constitute adequate and independent state grounds to preclude hearing an untimely claim on the merits."); *Crutchfield v. Warden*, 2014 U.S. Dist. LEXIS 111106 (S.D. Ohio Aug. 11, 2014) (finding that where the petitioner's motion for delayed appeal before the Ohio Supreme Court was denied, the petitioner must demonstrate cause for his default and actual prejudice to avoid dismissal).

It is well established that Cumberledge's failure to timely appeal to the Ohio Supreme Court, coupled with that court's denial of a motion for delayed appeal, results in a procedural default. Therefore, absent a showing of cause and prejudice sufficient to excuse the default, the petition should be dismissed.

### 2. Cause and Prejudice

Cumberledge did not file a traverse and, therefore, has not addressed the Respondent's argument that the habeas petition is procedurally defaulted. Nonetheless, in ground five of his petition, Cumberledge expressly contends that his appellate counsel failed to notify him of the appellate court's decision, thereby causing him to file an untimely appeal with the Ohio Supreme Court. (ECF No. 1 at 9.) According to an affidavit, filed in support of his motion for leave to file a delayed appeal, Cumberledge's appellate counsel did not inform him of the state appellate court's June 29, 2012 decision, and "it was not until the institution updated its LexisNexis database in October, 2012 when I learned the Eleventh District had issued its decision affirming the judgment of the Court of Common Pleas...." (ECF No. 9-1, Exh. 22 at ii.) Though

Cumberledge's allegation is unsubstantiated, for the purposes of this Report and Recommendation, it will be assumed to be true.

Ineffective assistance of appellate counsel can constitute cause sufficient to excuse a procedural default.  *Landrum v. Mitchell*, 625 F.3d 905, 916 (6th Cir.2010) *cert. denied*, 132 S. Ct. 127, 181 L. Ed. 2d 49 (2011); *Howard v. Bouchard*, 405 F.3d 459, 478 (6th Cir. 2005).  While there is no constitutional right to counsel in a direct appeal to the Ohio Supreme Court, *see Evitts v. Lucey,* 469 U.S. 387, 394 (1985); *Ross v. Moffitt,* 417 U.S. 600, 609-10 (1974), or on collateral review, including a 26(B) application to reopen, *see Lopez v. Wilson*, 426 F.3d 339, 352 (6th Cir. 2005), the Sixth Circuit has recognized that appellate counsel's performance is constitutionally ineffective when counsel fails to notify his client of the results of an appeal of right in a prompt manner so as to permit a timely discretionary appeal to be filed.  *Smith v. State of Ohio Rehab. and Corrections*, 463 F.3d 426, 433 (6th Cir. 2006), *reh'g. and reh'g en banc,* (2007).  Such ineffectiveness is cause for a procedural default in not filing a timely appeal with the Ohio Supreme Court.  *Id.; see, e.g., Edwards*, 529 U.S. at  451; *Murray*, 477 U.S. at 488-89. Appellate counsel's duties do not terminate the moment the court of appeals hands down its decision.  "Because a defendant is entitled to effective assistance of counsel on direct appeal, such an individual must be accorded effective assistance of counsel throughout *all* phases of that stage of the criminal proceedings."  *Smith*, 463 F.3d at 433.  A litigant must have, at a minimum, timely notice that his appeal was decided and that the clock for a discretionary appeal has started running.  "Providing that information is the responsibility of the appellate attorney.  Anything short of requiring the appellate attorney to discharge his [ ] responsibilities creates a legal 'Bermuda triangle' where even potentially valid claims disappear without ever being heard."

-15-

*Nix v. Warden, Warren Correctional Institution*, 2007 WL 2326866 (S.D. Ohio 2007) (*citing*

*Foster v. Money*, 2006 WL 3342725, (N.D. Ohio 2007)).

Therefore, when a petitioner alleges that his counsel's ineffective assistance led "to the

forfeiture of a proceeding itself" by denying him the opportunity to appeal, prejudice is

presumed. *Roe v. Flores-Ortega*, 528 U.S. 482, 483 (2000) (involved direct appeal to state

appellate court); *accord Smith*, 463 F.3d at 435.  As explained by the Sixth Circuit's decision in

*Smith*, however, for this presumption to apply, a petitioner must demonstrate that counsel's

deficient performance "actually cause[d] the forfeiture of the [petitioner's] appeal."  463 F.3d at

484.  In *Flores-Ortega*, the Supreme Court held that a petitioner claiming that counsel's failure

to consult with him regarding filing an appeal was entitled to the presumption of prejudice if he

could "demonstrate that there is a reasonable probability that, but for counsel's deficient failure

to consult with him about an appeal, he would have timely appealed."  528 U.S. at 483.  The

*Smith* decision applied a modified version of the *Flores-Ortega* standard.  The facts of the *Smith*

case are strikingly similar to the ones alleged herein:

> In assessing whether a defendant such as Smith "would have timely appealed," by
> considering whether the defendant "promptly expressed a desire to appeal," we
> apply a rebuttable presumption that if the period of time between when the
> defendant learned of the decision and when he or she attempted to appeal the
> decision is greater than the period allotted by state law for the timely filing of an
> appeal -- here, forty-five days -- the defendant fails to demonstrate that he or she
> "would have timely appealed" the decision but for the counsel's deficient failure
> to notify the defendant of the decision.  In the absence of other circumstances
> hindering the defendant's ability to attempt to appeal the decision within this time
> frame, allowing a greater amount of time would generally bestow a windfall upon
> the defendant whose counsel promptly failed to notify the defendant of a decision.
> Even accepting Smith's assertion and the district court's conclusion that he did
> not receive notice of the decision of the Ohio Court of Appeals until August 11,
> 2000, he did not take action to appeal the decision until February 2001,
> approximately five months after learning of the decision, well beyond the
> forty-five-day limit allowed under Ohio Supreme Court Rule II § 2(A)(1)(a).  For

-16-

> this reason, Smith has failed to establish prejudice as a result of his counsel's
> failure to notify him of the Ohio Court of Appeals decision denying his claims,
> and thus he cannot rely on his counsel's ineffective assistance to overcome the
> procedural default of his double jeopardy and insufficient evidence claims.

*Smith*, 463 F.3d at 435-436.

Cumberledge asserts that he learned of the appellate court's decision in October of 2012. (ECF No. 9-1, Exh. 22 at ii.)  Ohio S.Ct. R. 2.2(A)(1) required appeals to be perfected within 45 days.  Cumberledge, however, did not file his motion for delayed appeal until March 8, 2013. (ECF No. 9-1, Exh. 21.)  Thus, more than four months (perhaps as many as five) elapsed between the time Cumberledge learned of the decision and his attempt to file a delayed appeal. These facts are nearly identical to the five month delay in *Smith*, and therefore, this Court also finds that the rebuttable presumption does not apply.  As such, Cumberledge cannot demonstrate any prejudice resulting from counsel's alleged failure to notify him of the outcome of his appeal. Because a procedural default will not be excused absent a showing of both cause ***and*** prejudice, *Maupin*, 785 F.2d at 138-39, Cumberledge's claims remain defaulted.

Finally, while a petitioner's procedural default can also be excused where a petitioner is actually innocent in order to prevent a "manifest injustice" *Coleman*, 501 U.S. 722 at 749-50, Cumberledge has made no claim that he is actually innocent.

### IV.  Conclusion

For the foregoing reasons, it is recommended that Cumberledge's habeas petition be DISMISSED as procedurally defaulted.

/s/ Greg White
U.S. MAGISTRATE JUDGE

Date: November 17, 2014

## <u>OBJECTIONS</u>

      Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).